ANDREW L. PACKARD (State Bar No. 168690)
ERIK M. ROPER (State Bar No. 259756)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com

ROBERT J. TUERCK (Bar No. 255741)
Jackson & Tuerck
P.O. Box 148
429 W. Main Street, Suite C
Quincy, CA 95971
Tel: (530) 283-0406
E-mail: bob@jacksontuerck.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation, <br><br> Plaintiff, <br><br> vs. <br><br> USA WASTE OF CALIFORNIA, INC. a Delaware corporation, and MIKE DONOHUE, an individual, <br><br> Defendants, | Case No. _____ <br><br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. Section 1251, *et seq.* (the "Clean Water Act" or "the Act") against USA Waste of California, Inc. and Mr. Mike Donohue (hereafter

COMPLAINT

"Defendants"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. § 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration), 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. § 1319(d), 1365(a) (civil penalties).

2.     On or about March 4, 2010, Plaintiff provided notice of Defendants' violations of the Act, and of its intention to file suit against Defendants, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

3.     More than sixty days have passed since notice was served on Defendants and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district. Pursuant to Local Rule 120(d), intra-district venue is proper in Sacramento, California because the source of the violations is located within Butte County.

## II.    **INTRODUCTION**

5.     This complaint seeks relief for Defendants' discharges of pollutants from an approximately four-acre recycling, waste transfer and trucking facility ("the Facility") owned

and/or operated by Defendants USA Waste of California, Inc. and Mike Donohue.  The Facility discharges to the storm drain system for the City of Chico, which in turn drains to Comanche Creek, which ultimately drains to the Sacramento River, and the Sacramento-San Joaquin Delta.  Defendants' discharges of pollutants from the Facility are in violation of the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").  Defendants' violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

6.     The failure on the part of industrial facility operators such as Defendants to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of these receiving waters.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year.  With every rainfall event, hundreds of thousands of gallons of polluted storm water originating from industrial facilities discharge to Comanche Creek, the Sacramento River, and the Sacramento-San Joaquin Delta.

### III.  PARTIES

7.     Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Stockton, California. CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including Comanche Creek, the Sacramento River, and the Sacramento-San Joaquin Delta. CSPA is dedicated to the preservation, protection, and defense of the environment, and the wildlife and the natural resources of all waters of California.  To further these goals, CSPA actively seeks federal and state agency implementation of the Act and other laws and, where

COMPLAINT

3

1   necessary, directly initiates enforcement actions on behalf of itself and its members.

2       8.      Members of CSPA reside in California and use and enjoy California's

3   numerous rivers for recreation and other activities.  Members of CSPA use and enjoy the

4   waters of Comanche Creek, the Sacramento River, and the Sacramento-San Joaquin Delta,

5   into which Defendants have caused, are causing, and will continue to cause, pollutants to be

6   discharged.  Members of CSPA use these areas to fish, sail, boat, kayak, swim, birdwatch,

7   view wildlife and engage in scientific study, including monitoring activities, among other

8   things.  Defendants' discharges of pollutants threaten or impair each of those uses or

9   contribute to such threats and impairments.  Thus, the interests of CSPA's members have

10  been, are being, and will continue to be adversely affected by Defendants' ongoing failure to

11  comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff

12  caused by Defendants' activities.

13      9.      Continuing commission of the acts and omissions alleged above will

14  irreparably harm Plaintiff and the citizens of the State of California, for which harm they have

15  no plain, speedy or adequate remedy at law.

16      10.     Plaintiff is informed and believes, and thereupon alleges, that Defendants

17  USA Waste of California, Inc. is a corporation organized under the laws of the State of

18  Delaware, and that Defendant Mike Donohue is the District Manager of the Facility.

19  Accordingly, Defendants own and/or operate the Facility.

20  **IV.   STATUTORY BACKGROUND**

21      11.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

22  pollutant into waters of the United States, unless such discharge is in compliance with

23  various enumerated sections of the Act.  Among other things, Section 301(a) prohibits

24  discharges not authorized by, or in violation of, the terms of an NPDES permit issued

25  pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

26      12.     Section 402(p) of the Act establishes a framework for regulating municipal

27  and industrial storm water discharges under the NPDES program.  33 U.S.C. §1342(p).

28  States with approved NPDES permit programs are authorized by Section 402(p) to regulate

COMPLAINT

4

industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342.

13.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

14.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

15.     The General Permit contains certain absolute prohibitions.  Discharge Prohibition A(1) of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

16.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires existing dischargers to file their NOIs before March 30, 1992.

COMPLAINT

17.     Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in its storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).

18.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been established for pollutants discharged by Defendants:  pH – 6.0-9.0;  total suspended solids – 100 mg/L; oil & grease – 15.0 mg/L; chemical oxygen demand – 120 mg/L;  aluminum – 0.75 mg/L; copper – 0.0636 mg/L; iron – 1.0 mg/L;  lead – 0.0816 mg/L; zinc – 0.117 mg/L.  The State Water Quality Control Board has proposed adding a benchmark level for specific conductance of 200 µmhos/cm.

19.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") before October 1, 1992.  The SWPPP must comply with the BAT and BCT standards.  (Section B(3)).  The SWPPP must include, among other elements: (1) a narrative description and summary of all industrial activity, potential sources of pollutants and potential pollutants; (2) a site map showing facility boundaries, the storm water conveyance system, associated points of discharge, direction of flow, areas of industrial activities, and areas of actual and potential pollutant contact; (3) a description of storm water management practices, best management practices ("BMPs") and preventive maintenance undertaken to avoid storm water contamination that achieve BAT and BCT; (4) the location where Significant Materials are being shipped, stored, received and handled, as well as the typical quantities of such materials and the frequency with which they are handled; (5) a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities; (6) a summary of storm water sampling points; (7) a description of individuals and their responsibilities for

COMPLAINT

developing and implementing the SWPPP (Permit, Section A(3)); (8) a description of potential pollutant sources including industrial processes, material handling and storage areas, and dust and particulate generating activities; (9) a description of significant spills and leaks; (10) a list of all non-storm water discharges and their sources, and (11) a description of locations where soil erosion may occur (Section A(6)).  The SWPPP must also include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)).

20.     The SWPPP must be re-evaluated annually to ensure effectiveness and must be revised where necessary (Section A(9),(10)).  Section  C(3) of the General Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.  The report must be submitted to the Regional Board no later than 60 days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Section C(4)(a).  Section C(11)(d) of the General Permit's Standard Provisions also requires dischargers to report any noncompliance.  *See also* Section E(6).  Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

21.     The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Special Condition D(1)(a) of the General Permit and meeting each of the conditions set forth in Special Condition D(1)(b).

22.     The General Permit requires dischargers commencing industrial activities

COMPLAINT

7

before October 1, 1992 to develop and implement an adequate written Monitoring and Reporting Program no later than October 1, 1992.  Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

23.     The General Permit also requires dischargers to submit "Annual Reports" to the Regional Board.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must then conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS"), specific conductance, and total organic content ("TOC") or oil and grease, certain industry-specific parameters, and toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Section B(5) and Table D of the General Permit requires dischargers whose industrial activities fall within SIC Code 5093 to analyze their storm water discharge samples for iron, lead, aluminum, copper, zinc and chemical oxygen demand.  Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.  The monitoring and reporting program requires dischargers to certify, based upon the annual site inspections, that the facility is in compliance with the General Permit and report any non-compliance, and contains additional requirements as well.

24.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

25.     The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined to

COMPLAINT

include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

26.     A point source is defined as "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

27.     "Navigable waters" means "the waters of the United States."  33 U.S.C. § 1362(7).  Waters of the United States include tributaries to waters that are navigable in fact. Waters of the United States include man-made water bodies that are tributary to waters that are navigable in fact.  Waters of the United States include ephemeral waters that are tributary to waters that are navigable in fact.

28.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $32,500 per day for violations that occurred between March 15, 2004 and January 12, 2009, and an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

29.     The Regional Board has established water quality standards for the Sacramento River, and the Sacramento-San Joaquin Delta in the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins, generally referred to as the Basin Plan.

30.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."

31.     The Basin Plan establishes a standard for electrical conductivity in the Delta of 0.7 µmhos/cm from April 1 through August 31 and 1.0 µmhos/cm from September 1

through March 31.

32.     The Basin Plan provides that "[w]aters shall not contain chemical constituents in concentrations that adversely affect beneficial uses."

33.     The Basin Plan provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)."  The waters of the Sacramento River and the Delta have been designated by the State Board for use as municipal and domestic supply.

## V.     STATEMENT OF FACTS

34.     Defendants operate the Facility, an approximately four-acre recycling, waste transfer and trucking facility located at 2569 Scott Avenue, in Chico, California.  The Facility discharges water to the storm drain system for the City of Chico, which in turn drains to Comanche Creek, which ultimately flows into the Sacramento River, and the Sacramento-San Joaquin Delta.

35.     The Facility is classified under SIC Codes 5093 ("Processing, Reclaiming, and Wholesale Distribution of Scrap and Waste Materials") and 4212 ("Motor Freight Transportation and Warehousing").  Industrial activities occur throughout the Facility.  The Facility is primarily used as a waste transfer and recycling station.  Other current industrial activities occurring at the Facility involve the use, storage, and maintenance of motorized vehicles, including trucks used to haul materials to, from and within the Facility.  Many of these activities occur outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms and other storm water controls.  Plaintiff is informed and believes that Defendants' storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

36.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT.  The Facility lacks essential structural controls such as grading, berming and roofing to prevent rainfall and storm water

flows from coming into contact with these and other sources of contaminants, thereby allowing storm water to flow over and across these materials and become contaminated prior to leaving the Facility.  In addition, the Facility lacks structural controls to prevent the discharge of water once contaminated.  The Facility also lacks an adequate filtration system to treat water once it is contaminated.

37.     During rain events storm water laden with pollutants flows from the Facility and into the storm drain system for the City of Chico which then drains to Comanche Creek, which ultimately flows to the Sacramento River, and the Sacramento-San Joaquin Delta.

38.     Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to these waters during significant rain events.

39.     Comanche Creek, the Sacramento River, and the Sacramento-San Joaquin Delta are waters of the United States.

40.     Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.

41.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan.

42.     Information available to Plaintiff indicates the continued existence of unlawful storm water discharges at the Facility.

43.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement adequate monitoring, reporting and sampling programs for the Facility.  Plaintiffs are informed and believe, and thereupon allege, that Defendants have not sampled with adequate frequency, have not conducted visual monitoring, and have not analyzed the samples collected for the required pollutant parameters.

44.     Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

COMPLAINT

11

1

**VI.    CLAIMS FOR RELIEF**

2

**FIRST CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311(a), 1342)**

3

4

5

45.      Plaintiff incorporates the allegations contained in the above paragraphs as

though fully set forth herein.

6

7

46.      Discharge Prohibition A(2) of the General Permit requires that storm water

discharges and authorized non-storm water discharges shall not cause or threaten to cause

8

9

pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the

General Permit require that storm water discharges and authorized non-storm water discharges

10

11

shall not adversely impact human health or the environment, and shall not cause or contribute

to a violation of any water quality standards contained in a Statewide Water Quality Control

12

Plan or the applicable Regional Board's Basin Plan.

13

14

47.      Plaintiff is informed and believes, and thereupon alleges, that since at least

October 1, 1992, Defendants have been discharging polluted storm water from the Facility to

15

16

Comanche Creek, the Sacramento River, and the Sacramento-San Joaquin Delta in violation

of the General Permit.

17

18

48.      During every significant rain event, storm water flowing over and through

materials at the Facility becomes contaminated with pollutants, flowing untreated from the

19

Facility to Comanche Creek, the Sacramento River, and the Sacramento-San Joaquin Delta.

20

21

49.      Plaintiff is informed and believes, and thereupon alleges, that these discharges

of contaminated storm water are causing pollution and contamination of the waters of the

22

United States in violation of Discharge Prohibition A(2) of the General Permit.

23

24

50.      Plaintiff is informed and believes, and thereupon alleges, that these

discharges of contaminated storm water are adversely affecting human health and the

25

environment in violation of Receiving Water Limitation C(1) of the General Permit.

26

27

51.      Plaintiff is informed and believes, and thereupon alleges, that these discharges

of contaminated storm water are contributing to the violation of the applicable water quality

28

COMPLAINT

standards in the Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

52.   Plaintiff is informed and believes, and thereupon alleges, that every day since March 30, 1992, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit.  Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION
**Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

53.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

54.   Section A and Provision E of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate Storm Water Pollution Prevention Plan ("SWPPP") no later than October 1, 1992.

55.   Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendants' outdoor storage of industrial materials, including waste materials, without appropriate best management practices; the continued exposure of significant quantities of industrial material to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable water quality standards.

56.   Defendants have further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit.

57.   Each day since October 1, 1992 that Defendants have failed to develop and

implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

58.     Defendants have been in violation of the SWPPP requirement every day since October 1, 1992. Defendants continue to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
**Failure to Develop and Implement the Best Available
And Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

59.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

60.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

61.     Defendants have failed to implement BAT and BCT at the Facility for its discharges of total suspended solids, specific conductance, iron, pH, Oil and Grease, aluminum, chemical oxygen demand, lead, zinc, and unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

62.     Each day since March 5, 2005 that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

63.     Defendants have been in violation of the BAT and BCT requirements every day since at least March 5, 2005. Defendant continues to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement an adequate BAT and BCT for the Facility.

COMPLAINT

14

**FOURTH CAUSE OF ACTION**

**Failure to Develop and Implement an Adequate Monitoring and Reporting Program
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

64.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

65.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement a monitoring and reporting program (including, among other things, sampling and analysis of discharges) no later than October 1, 1992.

66.     Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility. Defendants' ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, their continuing failure to collect and analyze storm water samples from all discharge locations, their continuing failure to analyze storm water samples for all toxic chemicals and other pollutants likely to be present in the Facility's storm water discharges in significant quantities, and their failure to file required Annual Reports with the Regional Board which provide required information concerning the Facility's visual observations and storm water sampling and analysis.

67.     Each day since October 1, 1992 that Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**VII.   RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendants to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendants from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility;

COMPLAINT

15

c.   Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

d.   Order Defendants to pay civil penalties of $32,500 per day per violation for all violations occurring after March 15, 2004, and $37,500 per day per violation for all violations occurring after January 12, 2009, for each violation of the Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1 - 19.4 (pp. 200-202) (Dec. 31, 1996);

e.   Order Defendants to take appropriate actions to restore the quality of navigable waters impaired by their activities;

f.   Award Plaintiffs' costs (including reasonable attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

g.   Award any such other and further relief as this Court may deem appropriate.


Dated: May 4, 2010          Respectfully Submitted,

                                         LAW OFFICES OF ANDREW L. PACKARD


                            By:      /s/ Erik Roper
                                         Erik M. Roper
                                         Attorneys for Plaintiff
                                         CALIFORNIA SPORTFISHING
                                         PROTECTION ALLIANCE

**EXHIBIT A**



**California Sportfishing Protection Alliance**
*"An Advocate for Fisheries, Habitat and Water Quality"*
3536 Rainier Avenue, Stockton, CA 95204
Tel: 209-464-5067, Fax: 209-464-1028, E: deltakeep@aol.com

March 4, 2010

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Mike Donohue
District Manager
USA Waste of California, Inc.
2569 Scott Ave.
Chico, CA 95928

USA Waste of California, Inc.
c/o: C T Corporation System
818 West Seventh St.
Los Angeles, CA 90017

**Re:    Notice of Violations and Intent to File Suit Under the Federal Water
         Pollution Control Act**

Dear Mr. Donohue:

I am writing on behalf of the California Sportfishing Protection Alliance
("CSPA") in regard to violations of the Federal Water Pollution Control Act (the "Clean
Water Act" or "the Act") occurring at the USA Waste of California, Inc. (hereafter,
"USA Waste") waste transfer and recycling facility located at 2569 Scott Avenue in
Chico, California ("the Facility").  The WDID identification number for the Facility is
5R04I016186.  CSPA is a non-profit public benefit corporation dedicated to the
preservation, protection, and defense of the environment, wildlife and natural resources
of Little Butte Creek, the Sacramento River and other California waters.  This letter is
being sent to you as the responsible owner, officer, or operator of the Facility.  Based on
publicly available documents, CSPA is informed and believes USA Waste commonly
refers to, and may be formally doing business at the Facility as "North Valley Disposal"
(hereafter, "NVD").  For purposes of this Notice of Violations and Intent to File Suit
under the Act (hereafter, the "Notice"), unless otherwise noted, CSPA will refer to USA
Waste and NVD as NVD within this Notice.

This letter addresses NVD's unlawful discharges of pollutants from the Facility to
Little Butte Creek, which ultimately drains to the Sacramento River and the Sacramento-
San Joaquin Bay Delta ("the Delta").  This letter addresses the ongoing violations of the

Case 2:10-cv-01096-GEB-KJN   Document 1   Filed 05/04/10   Page 19 of 35
Notice of Violation and Intent To File Suit
March 4, 2010
Page 2 of 15

substantive and procedural requirements of the Clean Water Act and the National
Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001,
State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended
by Order No. 97-03-DWQ ("General Industrial Storm Water Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the
initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen
must give notice of intent to file suit.  Notice must be given to the alleged violator, the
U.S. Environmental Protection Agency ("the EPA"), and the State in which the violations
occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File
Suit provides notice of the violations that have occurred, and continue to occur, at the
Facility.  Consequently, NVD is hereby placed on formal notice by CSPA that, after the
expiration of sixty (60) days from the date of this Notice of Violation and Intent to File
Suit, CSPA intends to file suit in federal court against NVD under Section 505(a) of the
Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the
General Industrial Storm Water Permit.  These violations are described more fully below.

I.      **Background.**

NVD owns and/or operates the Facility as a recycling and trucking facility in
Chico, California.  The Facility is primarily used as a waste transfer and recycling station;
other current activities at the Facility include the use, storage, and maintenance of
motorized vehicles, including trucks used to haul materials to, from and within the
Facility.

On November 15, 2004, NVD submitted its notice of intent ("2004 NOI") to
comply with the terms of the General Industrial Storm Water Permit.  The 2004 NOI
reports that the Facility is classified solely as a local trucking facility under Standard
Industrial Classification code 4212 ("Local Trucking").  The Facility collects and
discharges storm water from its 3.7-acre industrial site through at least one discharge
point indirectly to Little Butte Creek, which ultimately drains to the Sacramento River
and the Sacramento-San Joaquin Bay Delta ("the Delta").  The Delta, the Sacramento
River, and the creeks that receive storm water discharges from the Facility are waters of
the United States within the meaning of the Clean Water Act.

The Central Valley Regional Water Quality Control Board ("Regional Board" or
"Board") has established water quality standards for the Sacramento River and the Delta
in the "Water Quality Control Plan for the Sacramento River and San Joaquin River
Basins," generally referred to as the Basin Plan.  The Basin Plan includes a narrative
toxicity standard which states that "[a]ll waters shall be maintained free of toxic
substances in concentrations that produce detrimental physiological responses in human,
plant, animal, or aquatic life."  For the Delta, the Basin Plan establishes standards for
several metals, including (at a hardness of 40 mg/L): arsenic – 0.01 mg/L; cadmium –

Notice of Violation and Intent To File Suit
March 4, 2010
Page 3 of 15

0.00022 mg/L; copper – 0.0056 mg/L; iron – 0.3 mg/L; and zinc – 0.016 mg/L.  *Id*. at III-3.00, Table III-1.  The Basin Plan states that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain lead in excess of 0.015 mg/L." *Id*. at III-3.00.  The Basin Plan also provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5."  *Id*. at III-6.00.  The Basin Plan also prohibits the discharges of oil and grease, stating that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses."  *Id*. at III-5.00

The Basin Plan also provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)."  *Id*. at III-3.0.  The EPA has issued a recommended water quality criteria for aluminum for freshwater aquatic life protection of 0.087 mg/L.  EPA has established a secondary MCL, consumer acceptance limit for aluminum of 0.05 mg/L to 0.2 mg/L.  EPA has established a secondary MCL, consumer acceptance limit for zinc of 5 mg/L.  EPA has established a primary MCL, consumer acceptance limit for the following: chromium – 0.1 mg/L; copper – 1.3 mg/L; and lead – 0.0 (zero) mg/L.  *See* http://www.epa.gov/safewater/ mcl.html.  The California Department of Health Services has also established the following MCL, consumer acceptance levels: aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); chromium – 0.5 mg/L (primary); copper – 1.0 (secondary); iron – 0.3 mg/L; and zinc – 5 mg/L.  *See* California Code of Regulations, title 22, §§ 64431, 64449.

EPA has also issued numeric receiving water limits for certain toxic pollutants in California surface waters, commonly known as the California Toxics Rule ("CTR").  40 CFR §131.38.  The CTR establishes the following numeric limits for freshwater surface waters:  arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous concentration); chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L (continuous concentration); copper – 0.013 mg/L (maximum concentration) and 0.009 mg/L (continuous concentration); lead – 0.065 mg/L (maximum concentration) and 0.0025 mg/L (continuous concentration).

The Regional Board has also identified waters of the Delta as failing to meet water quality standards for unknown toxicity, electrical conductivity, numerous pesticides, and mercury.  *See* http://www.swrcb.ca.gov/tmdl/docs/2002reg5303dlist.pdf.  Discharges of listed pollutants into an impaired surface water may be deemed a "contribution" to the exceedance of CTR, a water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures.  *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918 (9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (discharger covered by the General Industrial Storm Water Permit was "subject to effluent limitation as to certain pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

Notice of Violation and Intent To File Suit
March 4, 2010
Page 4 of 15

The General Industrial Storm Water Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by NVD: pH – 6.0-9.0; total suspended solids – 100 mg/L; oil & grease – 15.0 mg/L; and iron – 1.0 mg/L. The State Water Quality Control Board also recently proposed adding a benchmark level for specific conductance of 200 μmho/cm. Additional parameters for pollutants that CSPA believes are being discharged from the Facility are: aluminum – 0.75 mg/L; chemical oxygen demand ("COD") – 120 mg/L; copper – 0.0636 mg/L; lead – 0.0816 mg/L; mercury – 0.0024 mg/L; and zinc – 0.117 mg/L.

## II.      Pollutant Discharges in Violation of the NPDES Permit.

NVD violated and continues to violate the terms and conditions of the General Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit. The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT. Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand ("BOD") and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. *Id.*; 40 C.F.R. § 401.15.

Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Industrial Storm Water Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

On May 18 and 23, 2007, the Regional Board sent NVD a letter reviewing NVD's 2005-2006 Annual Report ("the Review Letter"). The Review Letter informed NVD that its 2005-2006 Annual Report evidenced that the Facility was discharging pollutants in excess of applicable EPA benchmarks. The Review Letter further ordered NVD to: (1) identify sources of pollutants at the Facility contributing to the exceedances; (2) review current BMPs; (3) modify existing BMPs or implement new BMPs to reduce or eliminate the discharge of pollutants in order to comply with the General Permit; (4) modify the Facility's SWPPP and Monitoring Plan to document such changes; and (5) provide the Regional Board a response by July 1, 2007 addressing NVD's efforts to implement the orders expressed in the Review Letter.

Notice of Violation and Intent To File Suit
March 4, 2010
Page 5 of 15

On June 30, 2007, NVD responded to the Review Letter indicating, among other things, that it believed that new BMPs it had implemented would reduce its discharges of iron in excess of EPA benchmarks.  Notwithstanding NVD's belief in the likely effectiveness of its BMPs, based on its review of available public documents, CSPA is informed and believes that NVD substantially failed to comply with the Regional Board's orders expressed in the Review Letter to the extent that the Facility's currently employed BMPs continue to fail to reduce or eliminate the discharge of pollutants in excess of EPA benchmarks.

More recently, on December 15, 2009, the Regional Board sent NVD a letter reviewing NVD's 2008-2009 Annual Report ("the Second Review Letter").  The Second Review Letter informed NVD that its 2008-2009 Annual Report established that the Facility was discharging pollutants in excess of EPA benchmarks.  Specifically, this letter states: "The levels of pollutants in your storm water samples indicate that the current BMPs implemented at your site are not sufficient to reduce pollutant concentrations below benchmark levels."  The Second Review Letter ordered NVD to:  (1) review previously submitted Annual Reports and identify the number of consecutive years that your facility has exceeded benchmark levels; (2) identify sources of pollutants at the Facility contributing to the exceedances; (3) review current BMPs;  (4) modify existing BMPs or implement new BMPs to reduce or eliminate the discharge of pollutants in order to comply with the General Permit; (5) modify the Facility's SWPPP and Monitoring Plan to document such changes; and, (6) provide the Regional Board a response by January 10, 2010 addressing NVD's efforts to implement the orders expressed in the Second Review Letter.

On December 28, 2009, NVD responded to the Second Review Letter. Notwithstanding NVD's assertion in this response that it "modifies or adds additional BMPs as necessary," its response includes specific data to the contrary.  To wit, its letter reports data from a storm water discharge sample collected on October 13, 2009 evidencing the fact that NVD continues to discharge pollutants in excess of benchmarks for, among other things, chemical oxygen demand (COD), aluminum (Al), zinc (Zn), iron (Fe) and lead (Pb).  NVD's December 28, 2009 letter is entirely non-responsive as to items (1) – (6), requested by the Regional Board on the Second Review Letter.  Based on its review of publicly available documents, CSPA is informed and believes that NVD continues to operate in violation of the General Permit.  NVD's ongoing violations are discussed further below.

A.     **NVD Has Discharged Storm Water Containing Pollutants in Violation of the Permit.**

NVD has discharged and continues to discharge stormwater with unacceptable levels of pH, total suspended solids (TSS), specific conductivity (SC), Iron (Fe), Oil and Grease (O&G), aluminum (Al), zinc (Zn), chemical oxygen demand (COD) and lead (Pb) in violation of the General Industrial Storm Water Permit.  These high pollutant levels have been documented during significant rain events, including the rain events indicated

Notice of Violation and Intent To File Suit
March 4, 2010
Page 6 of 15

in the table of rain data attached hereto as Attachment A.  NVD's Annual Reports and
Sampling and Analysis Results confirm discharges of materials other than stormwater
and specific pollutants in violation of the Permit provisions listed above.  Self-monitoring
reports under the Permit are deemed "conclusive evidence of an exceedance of a permit
limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge
Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the
General Industrial Storm Water Permit:

1.    **Discharges of Storm Water Containing Total Suspended Solids
      (TSS) at Concentrations in Excess of EPA Multi-Sector
      Benchmark Values.**

| Date | Parameter | Concentration in Discharge | EPA Benchmark Value |
|------|-----------|---------------------------|--------------------|
| 4/8/2005 | TSS | 650 mg/L | 100 mg/L |
| 2/27/2006 | TSS | 130 mg/L | 100 mg/L |

2.    **Discharges of Storm Water Containing Iron (Fe) at
      Concentrations in Excess of EPA Multi-Sector Benchmark
      Values.**

| Date | Parameter | Concentration in Discharge | EPA Benchmark Value |
|------|-----------|---------------------------|--------------------|
| 4/8/2005 | Fe | 76,000 µg/L | 1000 µg/L |
| 1/10/2006 | Fe | 1200 µg/L | 1000 µg/L |
| 2/20/2008 | Fe | 2120 µg/L | 1000 µg/L |
| 10/31/2008 | Fe | 2610 µg/L | 1000 µg/L |
| 10/13/2009 | Fe | 2010 µg/L | 1000 µg/L |

3.    **Discharges of Storm Water Containing Oil & Grease (O&G) at
      Concentrations in Excess of EPA Benchmark Value.**

| Date | Parameter | Discharge | EPA Benchmark Value |
|------|-----------|-----------|--------------------|
| 4/8/2005 | O&G | 59 mg/L | 15 mg/L |

4.    **Discharges of Storm Water Containing Specific Conductivity
      (SC) at Levels in Excess of Proposed Benchmark Value.**

| Date | Parameter | Concentration in Discharge | Proposed Benchmark Value |
|------|-----------|---------------------------|-------------------------|
| 4/08/2005 | SC | 280 µmhos/cm | 200 µmhos/cm |

Notice of Violation and Intent To File Suit
March 4, 2010
Page 7 of 15

5.   **Discharges of Storm Water Containing Aluminum (Al) in Excess of EPA Benchmark Value.**

| Date | Parameter | Discharge | EPA Benchmark Value |
|------|-----------|-----------|---------------------|
| 10/31/2008 | Al | 1.7 mg/L | 0.75 mg/L |
| 10/13/2009 | Al | 1.7 mg/L | 0.75 mg/L |

6.   **Discharges of Storm Water Containing Zinc (Zn) in Excess of EPA Benchmark Value.**

| Date | Parameter | Discharge | EPA Benchmark Value |
|------|-----------|-----------|---------------------|
| 10/31/2008 | Zn | 0.61 mg/L | 0.117 mg/L |
| 10/13/2009 | Zn | 0.35 mg/L | 0.117 mg/L |

7.   **Discharges of Storm Water Containing Chemical Oxygen Demand (COD) in Excess of EPA Benchmark Value.**

| Date | Parameter | Discharge | EPA Benchmark Value |
|------|-----------|-----------|---------------------|
| 10/31/2008 | COD | 210 mg/L | 120 mg/L |

8.   **Discharges of Storm Water Containing Lead (Pb) in Excess of EPA Benchmark Value.**

| Date | Parameter | Discharge | EPA Benchmark Value |
|------|-----------|-----------|---------------------|
| 10/13/2009 | Pb | 3.01 mg/L | 0.0816 mg/L |

CSPA's investigation, including its review of NVD's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's Benchmark Values and the Basin Plan's benchmark for pH, indicates that NVD has not implemented BAT and BCT at the Facility for its discharges of TSS, Iron (Fe), Oil and Grease (O&G), Specific Conductivity (SC), Aluminum (Al), Zinc (Zn), Chemical Oxygen Demand (COD), Lead (Pb) and other pollutants, in violation of Effluent Limitation B(3) of the General Permit. NVD was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations. Thus, NVD is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

CSPA is informed and believes that NVD has known that its stormwater contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least March 4, 2005. CSPA alleges that such violations also have occurred and will occur

Notice of Violation and Intent To File Suit
March 4, 2010
Page 8 of 15

on other rain dates, including during every single significant rain event that has occurred
since March 4, 2005, and that will occur at the Facility subsequent to the date of this
Notice of Violation and Intent to File Suit.  Attachment A, attached hereto, sets forth each
of the specific rain dates on which CSPA alleges that NVD has discharged storm water
containing impermissible levels of TSS, O&G, Iron (Fe), Specific Conductivity (SC),
Aluminum (Al), Zinc (Zn), Chemical Oxygen Demand (COD), Lead (Pb) and other un-
monitored pollutants in violation of Discharge Prohibitions A(1) and A(2) and Receiving
Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit.

These unlawful discharges from the Facility are ongoing.  Each discharge of
stormwater containing any pollutants from the Facility without the implementation of
BAT/BCT constitutes a separate violation of the General Industrial Storm Water Permit
and the Act.  Consistent with the five-year statute of limitations applicable to citizen
enforcement actions brought pursuant to the federal Clean Water Act, NVD is subject to
penalties for violations of the General Industrial Storm Water Permit and the Act since
March 4, 2005.

**B.      NVD Has Failed to Implement an Adequate Monitoring & Reporting
Plan.**

Section B of the General Industrial Storm Water Permit requires that dischargers
develop and implement an adequate Monitoring and Reporting Plan by no later than
October 1, 1992 or the start of operations.  Sections B(3), B(4) and B(7) require that
dischargers conduct regularly scheduled visual observations of non-storm water and
storm water discharges from the Facility and to record and report such observations to the
Regional Board.  Section B(5)(a) of the General Industrial Storm Water Permit requires
that dischargers "shall collect storm water samples during the first hour of discharge from
(1) the first storm event of the wet season, and (2) at least one other storm event in the
wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i)
further requires that the samples shall be analyzed for total suspended solids, pH, specific
conductance, and total organic carbon.  Oil and grease may be substituted for total
organic carbon.

NVD's 2004 NOI only designates the Facility as conforming to SIC 4212 – an
SIC which does not require sampling of additional analytical parameters found in Table
D of the General Permit.  However, on November 2, 2000, NVD filed an NOI
designating the Facility as conforming to both SIC 4212 and SIC 5093.  SIC 5093
governs recycling facilities.  CSPA's investigation has revealed that the Facility
continues to function as a recycling facility.  NVD's failure to accurately designate all
SICs applicable to the Facility constitutes yet another violation of the Act and the General
Permit.  Facilities such as NVD, which are required to be designated under SIC 5093, are
also required to sample for iron, lead, aluminum, copper, zinc and chemical oxygen
demand.  Section B(5)(c)(ii) of the General Permit requires dischargers to analyze
samples for all "[t]oxic chemicals and other pollutants that are likely to be present in
storm water discharges in significant quantities."

Notice of Violation and Intent To File Suit
March 4, 2010
Page 9 of 15

Based on its investigation, CSPA is informed and believes that NVD has failed to develop and implement an adequate Monitoring & Reporting Plan.  First, NVD has failed to collect storm water samples from each discharge point during at least two qualifying storm events (as defined by the General Permit) during each of the past five years.  Second, NVD has failed to analyze its storm water samples for all additional analytical parameters required for facilities designated under SIC 5093 (i.e., iron, lead, aluminum, copper, zinc and chemical oxygen demand) during each of the past five years.  Finally, CSPA is informed and believes that NVD has failed to conduct all required visual observations of non-storm water and storm water discharges at the Facility.  Each of these failures constitutes a separate and ongoing violation of the General Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, NVD is subject to penalties for violations of the General Industrial Storm Water Permit and the Act since March 4, 2005.  These violations are set forth in greater detail below.

       1.      **NVD Has Failed to Collect Storm Water Samples from Each Discharge Point During at least Two Rain Events In Each of the Last Five Years.**

Based on its review of publicly available documents, CSPA is informed and believes that NVD has failed to collect at least two storm water samples from all discharge points during qualifying rain events at the Facility during each of the past five years.  For example, CSPA notes that during the 2006-2007 wet season, NVD substantially failed to collect at least two storm water samples from the Facility's discharge point.  Contrary to the assertion in NVD's 2006-2007 Annual Report that it sampled two storm events, NVD effectively sampled only one storm event.  This failure to properly sample two storm events is evidenced by NVD's 2006-2007 Annual Report in its responses to Form 1 (Sampling & Analysis Results, First Storm Event).  NVD's responses on this portion of the 2006-2007 Annual Report only report a result for Oil & Grease discharges.

NVD attempted to explain away its failure to properly sample two storm events during the 2006-2007 wet season by blaming the laboratory (See note on bottom of Form 1: "Broken sample bottle by lab.").  However, this does not explain why NVD failed to even attempt to collect another sample prior to the expiration of the 2006-2007 wet season.  It is worth noting that the lab report attached to NVD's 2006-2007 Annual Report reveals that the allegedly compromised sample collected during the first storm event on November 2, 2006, was received by the lab on December 30, 2006.  Presumably if the lab broke the bottle it would have done so at some point near in time to December 30, 2006.  Thus, NVD had approximately five months remaining in the 2006-2007 wet season in which to sample a discharge from a second storm event in compliance with the requirements of the General Permit and the Act.  NVD's failure to sample two qualifying storm events constitutes an additional and separate violation of the General Permit.

Notice of Violation and Intent To File Suit
March 4, 2010
Page 10 of 15

Further, CSPA notes that NVD's 2006-2007 Annual Report admits that NVD failed to collect a storm water sample from the first storm event of the wet season. Contrary to its response to Attachment Summary Item 4, NVD failed to attach any explanation for its failure to sample the first storm event of the 2006-2007 wet season. NVD's failure to sample the first qualifying storm event constitutes an additional and separate violation of the General Permit.

Continuing its practice of failing to collect the required minimum of two storm water samples from each discharge point, NVD also failed to collect two storm water samples during the 2008-2009 wet season. Based on CSPA's review of publicly available rainfall data from this region and a review of the historic rainfall monitoring station data, NVD's assertion that there were no qualifying storm events after October 31, 2008 during the 2008-2009 wet season simply strains credulity. For example, records from a nearby precipitation monitoring station indicate that on Monday, December 15, 2008, no less than 0.37 inches of rain fell less than three miles from the Facility. Further, December 15, 2008 was directly preceded by more than three days with no rain. Given the amount of precipitation recorded, coupled with the sufficient amount of dry days directly preceding it, Monday, December 15, 2008 was clearly a qualifying storm event at the Facility . As stated above, each storm season NVD failed to sample two qualifying storm events constitutes an additional and separate violation of the General Permit.

Moreover, based on its investigation, CSPA is informed and believes that storm water discharges from the Facility at points other than those currently designated by NVD. Each of these failures to adequately monitor storm water discharges constitutes a separate and ongoing violation of the General Industrial Storm Water Permit and the Clean Water Act.

### 2.      NVD Has Failed to Analyze Its Storm Water for All Pollutants Required by the General Industrial Storm Water Permit.

Section B(5)(c)(ii) of the General Permit requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities." Based on its investigation, CSPA is informed and believes that NVD has failed to monitor for at least five other pollutants likely to be present in storm water discharges in significant quantities – chromium, manganese, mercury, nickel and nitrate+nitrite. NVD's failure to monitor these pollutants extends back at least until March 4, 2005. NVD's failure to monitor these mandatory parameters has caused and continues to cause multiple separate and ongoing violations of the General Permit and the Act.

### 3.      NVD Is Subject to Penalties for Its Failure to Implement an Adequate Monitoring & Reporting Plan Since March 4, 2005.

CSPA is informed and believes that available documents demonstrate NVD's consistent and ongoing failure to implement an adequate Monitoring Reporting Plan in

violation of Section B of the General Industrial Storm Water Permit.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, NVD is subject to penalties for these violations of the General Industrial Storm Water Permit and the Act since March 4, 2005.

**C.    NVD Has Failed to Implement BAT and BCT**.

Effluent Limitation B(3) of the General Industrial Storm Water Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  CSPA's investigation indicates that NVD has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids (TSS), Oil and Grease (O&G), iron (Fe), Specific Conductivity (SC), Aluminum (Al), Zinc (Zn), Chemical Oxygen Demand (COD), Lead (Pb) and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

To meet the BAT/BCT requirement of the General Permit, NVD must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility.  Based on the information available regarding the internal structure of the Facility, CSPA believes that at a minimum NVD must improve its housekeeping practices, store materials that act as pollutant sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters, treatment boxes or oil/water separator units), and/or prevent storm water discharge altogether.  NVD has failed to implement such measures adequately.

NVD was required to have implemented BAT and BCT by no later than October 1, 1992.  Therefore, NVD has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that NVD fails to implement BAT and BCT.  NVD is subject to penalties for violations of the Order and the Act occurring since March 4, 2005.

**D.    NVD Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

Section A(1) and Provision E(2) of the General Industrial Storm Water Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the Order to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

Notice of Violation and Intent To File Suit
March 4, 2010
Page 12 of 15

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)). The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)).

The SWPPP is required to include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)). Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

CSPA's investigation and review of available documents regarding conditions at the Facility indicate that NVD has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. In flagrant violation of the express wishes of the Regional Board in the communications to NVD discussed above, NVD has continuously failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. NVD has therefore been in continuous violation of Section A(1) and Provision E(2) of the General Industrial Storm Water Permit every day since October 1, 1992, and will continue to be in violation every day that NVD fails to develop and implement an adequate SWPPP. NVD is subject to penalties for violations of the Order and the Act occurring since March 4, 2005.

Notice of Violation and Intent To File Suit
March 4, 2010
Page 13 of 15

**E.     NVD Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP. The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard. Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, NVD is discharging elevated levels of total suspended solids, Iron (Fe), O&G, Specific Conductivity (SC), Aluminum (Al), Zinc (Zn), Chemical Oxygen Demand (COD) and Lead (Pb) that are causing or contributing to exceedances of applicable water quality standards. For each of these pollutants, NVD was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, NVD was aware of high levels of these pollutants prior to March 4, 2005. Likewise, NVD has not filed any reports describing its noncompliance with the General Industrial Storm Water Permit in violation of Section C(11)(d). Lastly, the SWPPP and accompanying BMPs do not appear to have been altered as a result of the annual evaluation required by Section A(9). NVD has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Industrial Storm Water Permit every day since March 4, 2005, and will continue to be in violation every day that NVD fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs. NVD is subject to penalties for violations of the General Industrial Storm Water Permit and the Act occurring since March 4, 2005.

**F.     NVD Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying

Notice of Violation and Intent To File Suit
March 4, 2010
Page 14 of 15

compliance with the General Industrial Storm Water Permit.  *See also* General Permit, Sections C(9) and (10) and B(14).

CSPA's investigation indicates that NVD has signed and submitted incomplete Annual Reports and purported to comply with the General Industrial Storm Water Permit despite significant noncompliance at the Facility.  As indicated above, NVD has failed to comply with the Permit and the Act consistently for at least the past five years; therefore, NVD has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time NVD submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past years.  NVD's failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act.  NVD is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since March 4, 2005.

**III.      Persons Responsible for the Violations.**

CSPA hereby puts Mike Donohue and USA Waste of California, Inc. on notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Mike Donohue and USA Waste of California, Inc. on notice that it intends to include those persons in this action.

**IV.      Name and Address of Noticing Party.**

Our name, address and telephone number is as follows: California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067.

**V.      Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard, Esq.
Erik Roper, Esq.
Law Offices of Andrew L. Packard
100 Petaluma Blvd North, Suite 301
Petaluma, California 94952
Tel. (707) 763-7227
Fax. (707) 763-9227
Email: Andrew@PackardLawOffices.com

And to:

Notice of Violation and Intent To File Suit
March 4, 2010
Page 15 of 15

Robert J. Tuerck, Esq.
Jackson & Tuerck
P.O. Box 148
429 W. Main Street, Suite C
Quincy, CA 95971
Tel: 530-283-0406
Fax: 530-283-0416
E-mail: Bob@JacksonTuerck.com

## VI.   Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Mike Donohue and USA Waste of California, Inc. to civil penalties of $32,500 per day per violation for all violations occurring after March 15, 2004, and $37,500 per day per violation for all violations occurring after January 12, 2009.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Mike Donohue and USA Waste of California, Inc. for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## SERVICE LIST

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Dorothy R. Rice, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Pamela Creedon, Executive Officer
Regional Water Quality Control Board
Central Valley Region
11020 Sun Center Drive #200
Rancho Cordova, CA 95670-6114

ATTACHMENT A

**Notice of Intent to File Suit, NVD (Chico, CA)**
**Significant Rain Events,* March 4, 2005-March 4, 2010**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| March | 19 | 2005 | Jan. | 04 | 2006 | Nov. | 26 | 2006 | Jan. | 08 | 2008 |
| March | 20 | 2005 | Jan. | 11 | 2006 | Nov. | 27 | 2006 | Jan. | 09 | 2008 |
| March | 21 | 2005 | Jan. | 14 | 2006 | Dec. | 09 | 2006 | Jan. | 11 | 2008 |
| March | 22 | 2005 | Jan. | 17 | 2006 | Dec. | 10 | 2006 | Jan. | 12 | 2008 |
| March | 27 | 2005 | Jan. | 18 | 2006 | Dec. | 11 | 2006 | Jan. | 21 | 2008 |
| March | 28 | 2005 | Jan. | 30 | 2006 | Dec. | 12 | 2006 | Jan. | 22 | 2008 |
| April | 02 | 2005 | Jan. | 31 | 2006 | Dec. | 13 | 2006 | Jan. | 24 | 2008 |
| April | 07 | 2005 | Feb. | 02 | 2006 | Jan. | 09 | 2007 | Jan. | 25 | 2008 |
| April | 08 | 2005 | Feb. | 26 | 2006 | Feb. | 08 | 2007 | Jan. | 26 | 2008 |
| April | 09 | 2005 | Feb. | 27 | 2006 | Feb. | 09 | 2007 | Jan. | 27 | 2008 |
| April | 11 | 2005 | Feb. | 28 | 2006 | Feb. | 10 | 2007 | Jan. | 28 | 2008 |
| April | 24 | 2005 | Mar. | 02 | 2006 | Feb. | 12 | 2007 | Jan. | 29 | 2008 |
| April | 25 | 2005 | Mar. | 03 | 2006 | Feb. | 13 | 2007 | Jan. | 31 | 2008 |
| April | 28 | 2005 | Mar. | 05 | 2006 | Feb. | 22 | 2007 | Feb. | 02 | 2008 |
| May | 05 | 2005 | Mar. | 06 | 2006 | Feb. | 24 | 2007 | Feb. | 19 | 2008 |
| May | 06 | 2005 | Mar. | 07 | 2006 | Feb. | 26 | 2007 | Feb. | 20 | 2008 |
| May | 08 | 2005 | Mar. | 12 | 2006 | Feb. | 28 | 2007 | Feb. | 21 | 2008 |
| May | 09 | 2005 | Mar. | 13 | 2006 | Mar. | 26 | 2007 | Feb. | 22 | 2008 |
| May | 10 | 2005 | Mar. | 14 | 2006 | Mar. | 27 | 2007 | Feb. | 23 | 2008 |
| May | 18 | 2005 | Mar. | 16 | 2006 | April | 11 | 2007 | Feb. | 24 | 2008 |
| May | 19 | 2005 | Mar. | 17 | 2006 | April | 12 | 2007 | Mar. | 15 | 2008 |
| Oct. | 15 | 2005 | Mar. | 20 | 2006 | April | 14 | 2007 | April | 23 | 2008 |
| Oct. | 17 | 2005 | Mar. | 21 | 2006 | April | 16 | 2007 | May | 24 | 2008 |
| Oct. | 26 | 2005 | Mar. | 24 | 2006 | April | 19 | 2007 | Oct. | 06 | 2008 |
| Oct. | 28 | 2005 | Mar. | 25 | 2006 | April | 21 | 2007 | Oct. | 31 | 2008 |
| Oct. | 31 | 2005 | Mar. | 27 | 2006 | April | 23 | 2007 | Nov. | 01 | 2008 |
| Nov. | 04 | 2005 | Mar. | 28 | 2006 | May | 02 | 2007 | Nov. | 03 | 2008 |
| Nov. | 08 | 2005 | Mar. | 29 | 2006 | May | 04 | 2007 | Nov. | 04 | 2008 |
| Nov. | 25 | 2005 | April | 02 | 2006 | Oct. | 01 | 2007 | Nov. | 10 | 2008 |
| Nov. | 28 | 2005 | April | 03 | 2006 | Oct. | 10 | 2007 | Dec. | 15 | 2008 |
| Nov. | 29 | 2005 | April | 04 | 2006 | Oct. | 12 | 2007 | Dec. | 24 | 2008 |
| Dec. | 01 | 2005 | April | 05 | 2006 | Oct. | 17 | 2007 | Dec. | 25 | 2008 |
| Dec. | 17 | 2005 | April | 10 | 2006 | Nov. | 10 | 2007 | Jan. | 05 | 2009 |
| Dec. | 18 | 2005 | April | 11 | 2006 | Nov. | 11 | 2007 | Jan. | 12 | 2009 |
| Dec. | 19 | 2005 | April | 12 | 2006 | Nov. | 13 | 2007 | Jan. | 13 | 2009 |
| Dec. | 20 | 2005 | April | 13 | 2006 | Dec. | 04 | 2007 | Jan. | 20 | 2009 |
| Dec. | 21 | 2005 | April | 16 | 2006 | Dec. | 07 | 2007 | Jan. | 28 | 2009 |
| Dec. | 22 | 2005 | April | 17 | 2006 | Dec. | 18 | 2007 | Feb. | 06 | 2009 |
| Dec. | 25 | 2005 | April | 22 | 2006 | Dec. | 19 | 2007 | Feb. | 09 | 2009 |
| Dec. | 26 | 2005 | April | 24 | 2006 | Dec. | 20 | 2007 | Feb. | 11 | 2009 |
| Dec. | 27 | 2005 | May | 21 | 2006 | Dec. | 21 | 2007 | Feb. | 12 | 2009 |
| Dec. | 28 | 2005 | May | 22 | 2006 | Dec. | 28 | 2007 | Feb. | 13 | 2009 |
| Dec. | 29 | 2005 | Oct. | 05 | 2006 | Dec. | 29 | 2007 | Feb. | 15 | 2009 |
| Dec. | 30 | 2005 | Nov. | 03 | 2006 | Jan. | 03 | 2008 | Feb. | 16 | 2009 |
| Dec. | 31 | 2005 | Nov. | 11 | 2006 | Jan. | 04 | 2008 | Feb. | 17 | 2009 |
| Jan. | 01 | 2006 | Nov. | 13 | 2006 | Jan. | 05 | 2008 | Feb. | 18 | 2009 |
| Jan. | 03 | 2006 | Nov. | 16 | 2006 | Jan. | 07 | 2008 | Feb. | 23 | 2009 |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT A**

**Notice of Intent to File Suit, NVD (Chico, CA)**
**Significant Rain Events,\* March 4, 2005-March 4, 2010**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Feb. | 24 | 2009 | Nov. | 18 | 2009 | Dec. | 30 | 2009 | Jan. | 26 | 2010 |
| Feb. | 26 | 2009 | Nov. | 23 | 2009 | Jan. | 04 | 2010 | Jan. | 27 | 2010 |
| Mar. | 01 | 2009 | Nov. | 27 | 2009 | Jan. | 12 | 2010 | Jan. | 30 | 2010 |
| Mar. | 02 | 2009 | Nov. | 30 | 2009 | Jan. | 13 | 2010 | Feb. | 01 | 2010 |
| Mar. | 03 | 2009 | Dec. | 11 | 2009 | Jan. | 14 | 2010 | Feb. | 04 | 2010 |
| Mar. | 04 | 2009 | Dec. | 12 | 2009 | Jan. | 17 | 2010 | Feb. | 06 | 2010 |
| Mar. | 23 | 2009 | Dec. | 13 | 2009 | Jan. | 18 | 2010 | Feb. | 08 | 2010 |
| April | 09 | 2009 | Dec. | 14 | 2009 | Jan. | 19 | 2010 | Feb. | 09 | 2010 |
| May | 01 | 2009 | Dec. | 16 | 2009 | Jan. | 20 | 2010 | Feb. | 22 | 2010 |
| May | 02 | 2009 | Dec. | 20 | 2009 | Jan. | 21 | 2010 | Feb. | 24 | 2010 |
| May | 05 | 2009 | Dec. | 21 | 2009 | Jan. | 22 | 2010 | Mar. | 03 | 2010 |
| Oct. | 13 | 2009 | Dec. | 27 | 2009 | Jan. | 24 | 2010 | | | |
| Oct. | 14 | 2009 | Dec. | 29 | 2009 | Jan. | 25 | 2010 | | | |

\* Dates gathered from publicly available rain and weather data collected at stations located near the
Facility.